UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| ROSE A. QUINN,<br><br>               Plaintiff,<br><br>   vs.<br><br>NANCY A. BERRYHILL, ACTING<br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>              Defendant. | 4:17-CV-04013-KES<br><br>MEMORANDUM OPINION AND<br>ORDER REVERSING THE DECISION<br>OF THE COMMISSIONER |

Plaintiff, Rose A. Quinn, seeks review of the decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits (SSDI) under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 1382. The Commissioner opposes the motion and urges the court to affirm the denial of benefits. For the following reasons, the court reverses the decision of the Commissioner.

## PROCEDURAL HISTORY

Quinn filed an application for SSDI and SSI on November 12, 2013, alleging disability since August 1, 2013. AR 180. The Commissioner denied her claim initially on March 18, 2014, and upon reconsideration on September 19, 2014. AR 109, 116. Quinn then appeared with counsel before Administrative Law Judge (ALJ) Denzel R. Busick at an administrative hearing on November

20, 2015. *See* AR 28 (transcript of hearing). The ALJ issued an opinion affirming the denial of benefits on December 16, 2015. AR 22. The Appeals Council denied Quinn's request for review on December 12, 2016. AR 1. Thus, Quinn's appeal of the Commissioner's final decision is properly before the court under 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

Quinn was born August 10, 1960. AR 33. She was 53 years old at the alleged disability onset date, and thus 55 years old at the time of her hearing before the ALJ. *Id.* Quinn obtained her GED, graduated from a vocational technical school's human services technician program, and obtained an Associate's degree from Colorado Technical University. *Id.* She has also completed two years of college. AR 225. Quinn reported working a number of jobs since 2000. Specifically, she worked at the Sioux Falls area humane society until 2005 or 2006 as a cruelty investigator humane officer, she was the founder and director of the Second Chance Rescue Center until 2011, and at the time of her hearing, she worked 16 hours a week as a receptionist at Inner Lights Community Action. AR 33-35. Quinn has also received a rent reduction as the manager of her trailer park since 2007. AR 35-36.

Quinn's primary care provider has been Troy VanOverbeke, a Physician's Assistant with Sanford. PA VanOverbeke treated Quinn for depression in 2011, and he has prescribed different amounts of Effexor and Zanax since then. *See* AR 337-38. He has also treated Quinn for anxiety. *See* AR 398-99 (changing medication dosage on December 2, 2013 visit); AR 576 (discussing side effects

2

of medication on March 31, 2014 visit). He managed the care for Quinn's ongoing lower back pain, leg weakness, and bilateral foot numbness since Quinn fell while walking up stairs in July 2013. *See* AR 391 (noting backward fall, bilateral foot numbness for prior six months, low back pain on July 22, 2013 visit); AR 600 (noting continued numbness in toes, difficulty walking on May 30, 2014 visit). PA VanOverbeke also filled out a Definitions of Rating Terms form for Quinn on October 30, 2015. AR 838-40.

On September 16, 2013, Dr. Assam at Sanford performed an EMG on Quinn, which measures electrical activity in response to a nerve's stimulation of muscle. AR 472-73. Dr. Assam noted mild neuropathy (nerve damage), but the EMG was negative for evidence of radiculopathy, plexopathy, or myopathy. AR 475.

Quinn was referred to Dr. Ansari, a neurologist, for lower extremity paresthesias. AR 292. Dr. Ansari noted that Quinn had a history of anxiety, depression, tobacco use, and lower back pain. *Id.* She reported that her lower extremity numbness and tingling sensation were becoming progressively worse over the eight months prior to seeing Dr. Ansari on October 8, 2013. *Id.* Dr. Ansari diagnosed Quinn with mild peripheral polyneuropathy, but noted her symptoms were well controlled without medication, and chronic back pain with leg weakness. AR 296. Following an MRI on her lower back on October 17, 2013, the radiologist at Sanford noted "extensive disk disease and degenerative change throughout the lumbar spine," including mild to moderate spinal

stenosis at the L3-L4 level and severe stenosis at the right L5-S1 neural foramen. AR 322-23.

On November 20, 2013, Quinn saw Dr. Chris Janssen, a Sanford Physical Medicine and Rehabilitation specialist, for her low back pain and bilateral leg pain. AR 494. At this visit, she reported weakness in her legs when standing for a long period of time and sharp, aching pain. *Id.* Dr. Janssen noted Quinn was not a candidate for surgery and recommended five weeks of physical therapy. AR 496. While Quinn reported the physical therapy appeared to help at first (AR 513), her pain continued. AR 518. *See also* AR 457 (physical therapy notes for lower back pain in December 2013). At her February 3, 2014 visit with Dr. Janssen, she explained her lower back pain was worse with increased activity and worse with bending and twisting. AR 530. Dr. Janssen started Quinn on Cymbalta, but she suffered side effects. AR 560. Dr. Janssen also filled out a Definitions of Rating Terms form on an unknown date. AR 627-629.

Quinn continued participating in physical therapy at McCook Therapy for her low back pain in 2014. AR 609. She also visited Dean Berg, DC, FACO, a chiropractor at Total Health Chiropractic numerous times in 2013 and 2014. *See* AR 570 (diagnosing subluxation/nonallopathic lesion, lumbar region); AR 571 (same); AR 572 (same). Dr. Berg noted that Quinn appeared to respond favorably to chiropractic treatment. AR 571.

On June 18, 2014, Quinn was seen by Dr. Sanders for her low back pain. AR 617. Dr. Sanders reviewed her previous MRI and performed an

epidural steroid injection at Quinn's L3-L4 level. AR 620. At her July 14, 2014 visit, Quinn reported the injection helped but activity still aggravated her back. AR 621. Dr. Sanders noted Quinn's limited range of motion, pain with motion, but a negative straight leg raise bilateral test. AR 621-22. Quinn received a second epidural steroid injection. AR 624.

Quinn claims she still suffers from lower back pain, numbness in her toes, and walking is very difficult. AR 600. There is also evidence that she has scoliosis. AR 326. Following a June 17, 2015 X-ray on her left elbow, the radiologist noted some degenerative changes. AR 792. She also had an MRI on her cervical spine on July 15, 2015, which shows shoulder pain, radiculopathy, some disk protrusion, but significant spinal stenosis is not present in her neck. *See* AR 742 (Sanford radiologist, DO Free, noting impression of disk disease and degenerative change in cervical spine).

## ADMINISTRATIVE HEARING

During the administrative hearing, the ALJ heard testimony from Quinn and James Miller, a vocational expert. Quinn, represented by counsel at the hearing, testified about her education and her work experience as a cruelty investigator humane officer, director of the Second Chance Rescue Center, and as a part time receptionist. AR 33-35. She testified that while she did some physical work and lifted kennels with several animals in them while working at the humane society, she cut back how much weight she lifted when she was the director of the rescue center. AR 34-35. She does not do heavy lifting at her current job as a receptionist. AR 35.

Quinn then testified about her physical problems that make it difficult for her to continue working. AR 36. Specifically, she discussed her low back pain, neck problems, anxiety due to her fear that she will fall again, and the numbness in her toes. AR 36-37. She testified that when she stands to wash dishes, she has to bend over after ten minutes because the pressure in her back causes fatigue in her legs. AR 39. Quinn stated that she can only stand for 10-15 minutes at a time, but she often has to lean against something during that period of time, and she cannot sit for very long either. *Id.* She can only lift and carry 10-15 pounds, she cannot pull 10-15 pounds but she would "try" to push 10-15 pounds. AR 41.

Quinn testified that she was taking 800 milligrams of Ibuprofen a day, Ambien to fall asleep, Effexor for anxiety and stress, a triglyceride for cholesterol, water pills, and she used a prescription cream on her back. AR 42. In order to alleviate her back and neck pain, Quinn explained that she moves around a lot and tries to see her chiropractor to relieve the pressure. AR 43. At the time of her hearing, Quinn lived in a house with her teenage son. *Id.* In a typical day, she cleans and cooks, but she needs her son's help with the yard work. AR 44.

Prior to Quinn's administrative hearing, Miller submitted a Work History report, which listed manager mobile home park, manager animal shelter, and dog catcher as Quinn's past jobs. AR 286. He noted that Quinn acquired the skills of managing the mobile home park, collecting rent, showing facilities, and directing maintenance staff from her job as manager of the mobile home park.

*Id.* He listed no acquired skills from her position as manager of the animal shelter and noted her acquired skills of protecting animals, capturing strays, and caring for animals from her position as dog catcher. *Id.*

In response to the hypothetical question posed by the ALJ, Miller testified that someone with Quinn's impairments could not perform her past work as a manager of an animal shelter "as she did it[,]" but could perform this work as it is described in the Dictionary of Occupational Titles (DOT). AR 49. Miller also testified that someone with Quinn's impairments could perform the manager of a mobile home park position "as she did it," but could not do her past work as a dog rescuer. AR 50.

The ALJ then posed a hypothetical to Miller about a person whose pain moderately interferes with concentration, persistence, or pace and who is limited to routine tasks of three to four steps. AR 50-51. In response, Miller testified that such a person could not perform Quinn's past work at a light level, but noted to the ALJ: "I think you are coming up with more of an unskilled level." AR 51. Miller then indicated that the skills Quinn acquired in her past work would be transferable to some office clerical types of jobs. AR 51. He identified positions such as general office clerk, file clerk, or storage facility clerk as available in the national economy. AR 51-52. When accounting for concentration limitations, Miller testified that a person could only perform unskilled positions, such as an inspector hand packager, which is available in the national economy. AR 52.

**ALJ DECISION**

Employing the five-step analysis associated with an application for social security benefits, the ALJ denied Quinn's claim on December 16, 2015. AR 22. At step one, the ALJ found that Quinn has not engaged in substantial gainful activity since August 1, 2013, the alleged onset date. AR 15. At step two, the ALJ determined Quinn has the following severe impairments: degenerative disc disease, peripheral neuropathy, anxiety, and affective disorder. *Id.*

At step three, the ALJ concluded Quinn does not have an impairment, or combination of impairments, that meets or medically equals the severity required under 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* At step four, the ALJ found that Quinn cannot perform her past relevant work, but concluded that she has the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).[1] At step five, the ALJ found that Quinn has acquired work skills from past relevant work that are transferable to other occupations with jobs available in the national economy. AR 21. Thus, the ALJ concluded that Quinn is not disabled under the Social Security Act.

---

[1] The ALJ found Quinn "can lift and carry 20 pounds on occasion and 10 pounds or less frequently. She can sit at [sic] total of 6 hours as well as stand and walk, combined, a total of 6 hours in an 8-hour workday. She has no limits in reaching. She can climb stairs occasionally, but must avoid climbing ladders and scaffolds. She can frequently, not constantly, balance, stoop, kneel, crouch and crawl." AR 17. The ALJ further found Quinn "has limitations in concentration, persistence and pace . . . which limit her to work involving only simple, routine and repetitive tasks of about three to four steps." *Id.*

## STANDARD OF REVIEW

The court must uphold the ALJ's decision if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). " 'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the conclusion.' " *Teague*, 638 F.3d at 614 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). When reviewing the record, "the court 'must consider both evidence that supports and evidence that detracts from the Commissioner's decision.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007)). If the Commissioner's decision is supported by substantial evidence in the record as a whole, the court may not reverse it merely because substantial evidence also exists in the record that would support a contrary position or because the court would have determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commissioner's construction

of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

### THE FIVE STEP PROCEDURE FOR DISABILITY DETERMINATIONS

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(3)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). An ALJ must apply a five-step procedure when determining if an applicant is disabled. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993). The steps are as follows:

**Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b); 20 C.F.R. § 416.920(b).

**Step Two**: Determine whether the applicant has an impairment or a combination of impairments that are severe. 20 C.F.R. § 404.1520(c); 20 C.F.R. § 416.920(c).

**Step Three**: Determine whether any of the severe impairments identified in Step Two match the listing in Appendix 1. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 416.920(d).

**Step Four**: Considering the applicant's RFC, determine whether the applicant can perform any past relevant work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 416.920(e).

**Step Five**: Determine whether any substantial gainful activity exists in the national economy that the applicant can perform. 20 C.F.R. § 404.1520(f); 20 C.F.R. § 416.920(f).

## DISCUSSION

Quinn urges the court to reverse the ALJ's decision for the following reasons: (1) the ALJ did not properly identify Quinn's past relevant work; (2) the Commissioner failed to meet her burden at step 5 to identify jobs, based on substantial evidence, that Quinn could perform; (3) the ALJ's mental RFC finding is not supported by substantial evidence; (4) the ALJ failed to identify all of Quinn's severe impairments; and (5) the ALJ erred in evaluating the opinion of Quinn's treating physician's assistant. Docket 14. The court will address these arguments in the order of the five-step procedure outlined above. Quinn also requests the court to remand the case with instructions for the Commissioner to award benefits. *Id.* at 39.

## I.    Step Two

In step two, the ALJ must determine whether the claimant has an impairment or combination of impairments that are severe. 20 C.F.R. § 404.1520(c); 20 C.F.R. § 416.920(c). In other words, the ALJ must determine if the claimant's impairment(s) "significantly limits [her] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 1520(c).

11

The ALJ found that Quinn's severe impairments are degenerative disc disease, peripheral neuropathy, anxiety and affective disorder. AR 15. Quinn argues that the ALJ never discussed whether Quinn's scoliosis is a medically determinable impairment, and thus a severe impairment, even though the ALJ had noted Quinn allegedly suffered from scoliosis. Docket 14 at 32. Additionally, Quinn argues the ALJ failed to mention Quinn's weight or consider whether she suffered from obesity as a severe impairment, and failed to discuss whether Quinn's neck pain was a medically determinable, and thus possibly severe, impairment. *Id.* at 33.

In response, the Commissioner first states that "the United States Supreme Court held an ALJ's failure to find a particular impairment severe at step two is not reversible error" if the ALJ finds some other impairment is severe. Docket 18 at 4 (citing *Bowen v. Yuckert*, 482 U.S. 137, 156 (1987) (O'Connor, J., concurring)). As Quinn noted in her reply, Justice O'Connor's concurring opinion in *Bowen* is not a holding of the Court. In fact, the Eighth Circuit has indicated that an ALJ's failure to identify a severe impairment, when that impairment is diagnosed and supported by sufficient medical evidence, is not harmless error. *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007); s*ee Lund v. Colvin*, 2014 WL 1153508, at *26 (D. Minn. Mar. 21, 2014) (discussing district court cases within the Eighth Circuit that have interpreted *Nicola* to mean any error at step two requires reversal, while other district courts in the circuit have declined to read such a *per se* rule from *Nicola*). And while the claimant has the burden to demonstrate that an impairment is

severe, this is not a difficult burden to meet. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001). An impairment is severe unless "it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). Any doubt as to whether the claimant has met her burden is resolved in favor of the claimant. *Dewald v. Astrue*, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008) (citing SSR 85-28).

The Commissioner maintains that because Quinn worked in the past while she suffered from scoliosis and obesity, her conditions did not preclude her from work. Docket 18 at 5 (citing *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001)). But the *Gowell* court discussed the claimant's continued work despite her alleged conditions in the context of her credibility regarding her subjective complaints of pain. *Gowell*, 242 F.3d at 796. The Eighth Circuit analysis in *Gowell* had nothing to do with an ALJ's step two assessment. Furthermore, this argument does not address Quinn's point: that is, the ALJ never determined whether Quinn's scoliosis, obesity, and neck condition were medically determinable impairments at step two. And it is medically determinable impairments, not just impairments in general, that later guide an ALJ's RFC analysis and decision. *See* SSR 96-8p.

Obesity, if diagnosed by a treating source or consultative examiner or identified in medical records, is a medically determinable impairment under the regulations. SSR 02-1p. Quinn argues the ALJ did not address Quinn's weight even though her medical records consistently show high weight. Further,

because Quinn's scoliosis and neck impairment were not identified as medically determinable impairments, Quinn argues that limitations arising from these conditions should have been included in the ALJ's RFC analysis at step four. Docket 14 at 32-34.

The court agrees with Quinn. Here, the ALJ did not mention Quinn's obesity, and he did not make a finding as to whether Quinn's scoliosis or neck impairment—which he noted Quinn testified about—were medically determinable impairments that were either severe or not severe. There is evidence in the record to support such diagnoses, so they should have been addressed in the step two analysis. Because medically determinable impairments are so important to the RFC analysis at step four, the court finds that the ALJ's insufficient findings regarding Quinn's medically determinable severe impairments at step two require remand for further development.

## II.   Step Four

In order to complete step four, the Commissioner must determine the claimant's RFC, which is the most the claimant can do despite the claimant's mental and physical limitations. *Brown v. Barnhart*, 390 F.3d 535, 538-39 (8th Cir. 2004) (citing 20 C.F.R. § 404.1545(a)(1)). Then, the ALJ must determine whether the claimant's impairments, taking the claimant's RFC into consideration, preclude the performance of past relevant work. 20 C.F.R. § 404.1520(f). Three of Quinn's arguments challenging the ALJ's denial of benefits relate to step four of the analysis: the ALJ's mental RFC determination,

the overall weight given to Quinn's treating provider, and Quinn's past relevant work.

## A. Mental RFC

An ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians, and the claimant's own description of her limitations. *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006). The ALJ's RFC finding "must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003).

Here, the ALJ determined Quinn's severe mental impairments included affective disorder and anxiety disorder. AR 15. Quinn argues that the ALJ's subsequent findings on Quinn's limitations in activities of daily living, social functioning, and concentration, persistence, and pace based on those mental impairments were erroneous. Docket 14 at 29-31. In other words, while the ALJ properly recognized Quinn's severe mental impairments, the ALJ improperly determined the resulting limitations on Quinn's RFC and their severity. *Id.*

Quinn points to the ALJ's following findings: she had mild limitations in activities of daily living, mild difficulty in social functioning, and moderate difficulty in concentration, persistence, and pace. Docket 14 at 29 (citing AR 16). This portion of the ALJ's analysis, however, is related to step three. The ALJ specifically noted that such limitations "are not a RFC assessment" and "[t]he mental RFC assessment used at steps 4 and 5 . . . requires a more

15

detailed assessment . . . ." AR 17. The ALJ then conducted a further RFC

analysis under step four. *See* AR 17-21. As the Commissioner maintains

(Docket 18 at 13), an ALJ is not required to include step two and step three

findings regarding limitations in step four's RFC limitations. *See Lacroix v.*

*Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006) (rejecting claimant's argument

that step two's mental impairment limitations must be included in ALJ's step

four RFC analysis).

Quinn also argues that the ALJ failed to note Quinn's history of

depression and anxiety. Docket 14 at 30. In determining Quinn's mental RFC,

the ALJ noted he was "cognizant of the substantial overlap in symptomology

between different mental impairments . . . . Accordingly, her psychological

symptoms and their effect on her functioning have received consideration

together, instead of separately, regardless of the diagnostic label attached." AR

19. The ALJ then cited to several medical records in support of his mental RFC

finding, some of which noted Quinn's medical history of depression and

anxiety. AR 19-20 (citing AR 295, AR 531).

The court is aware of the medical records establishing other mental

issues as cited by Quinn (Docket 14 at 30), but it is not this court's job to

reweigh the evidence regarding the ALJ's RFC assessment. And while an ALJ

may formulate common-sense judgments about the RFC based on medical

findings, an ALJ cannot act as a medical expert. *Dixon v. Barnhart*, 324 F.3d

997, 1002 (8th Cir. 2003). The ALJ's statement that he considered

psychological symptoms together, instead of separately, when symptoms of

different mental impairments overlap appears to be more of a common-sense judgment rather than improper medical findings by the ALJ. And this court has not found any authority declaring such consideration to be error. Thus, the court finds the ALJ's mental RFC assessment is supported by substantial evidence in the record.

**B.    Weight Given to Treating Provider**

Quinn contends that the ALJ erred in giving the opinion of PA VanOverbeke, Quinn's treating provider, limited weight. Docket 14 at 34-39. "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(c)(2). The ALJ must give the treating source's medical opinion controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record[.]" *Id.* Additionally, SSR 96-2p provides that:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically accepted clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996).

At the time of the ALJ's decision, a physician's assistant (PA) was not considered an acceptable medical source. SSR 06-03p, 2006 WL 2329939, at *1 (Aug. 9, 2006). *See also* 20 C.F.R. § 404.1527. PA's were instead classified as "other sources." *Id.*

The adjudicator is to apply the same factors to the opinions of nonacceptable medical sources as applied to acceptable medical sources. *See* 20 C.F.R. § 404.1527(f). The factors include the examining relationship, the treatment relationship, length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and a catchall other factors that the claimant brings to the attention of the adjudicator. 20 C.F.R. § 404.1527(c). After applying any applicable factors, which depend on the facts of each particular case,

> an opinion from a medical source who is not an acceptable medical source or from a nonmedical source may outweigh the medical opinion of an acceptable medical source, including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an acceptable medical source if he or she has seen the individual more often than the treating source, has provided better supporting evidence and a better explanation for the opinion, and the opinion is more consistent with the evidence as a whole.

20 C.F.R. § 404.1527(f)(1).

Quinn asserts the ALJ erred by giving PA VanOverbeke's opinion limited weight. Docket 14 at 36. PA VanOverbeke was the treating provider of Quinn, and he has the most substantial evidence in the record establishing a treating relationship with Quinn over the years. But PA VanOverbeke was not

considered an acceptable medical source at the time of the ALJ's decision. Despite his classification as an "other source" under the regulations, Quinn argues that the ALJ improperly weighed PA VanOverbeke's opinion because no other provider examined Quinn and opined on her limitations after her neck and elbow impairments were diagnosed. Docket 14 at 37-38.

An ALJ must use "at least some" medical evidence to support his RFC determination. *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010). But the Eighth Circuit has long held "that the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision." *Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir. 2003).

Because the court has already determined remand is appropriate to reevaluate and document whether Quinn had additional medically determinable, and possibly severe, impairments, the ALJ's assessment at step four may change, including what weight to give to treating providers. The court is cognizant that it cannot reweigh the evidence presented to the ALJ. *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003). But on remand, the ALJ should provide additional analysis on whether this is an appropriate case to give more weight to PA VanOverbeke as Quinn's main treating source after applying the factors outlined in 20 C.F.R. § 404.1527. *See also Shontos v. Barnhart*, 328 F.3d 418, 426-27 (8th Cir. 2003) (reaffirming that "other" sources, such as physicians' assistants, generally are given more weight than non-treating, non-examining sources).

## C.    Past Relevant Work

Past relevant work includes substantial gainful activity that the claimant performed within the past 15 years, and that lasted long enough for the claimant to learn to perform it. 20 C.F.R. § 404.1560(b)(1). An earnings test is often used to determine whether past work is substantial gainful activity. 20 C.F.R. § 404.1574(a). At the time of Quinn's hearing and subsequent decision by the ALJ, a claimant must have earned $1,090 per month on average from a job in order for that job to be considered substantial gainful activity. *See* https://www.ssa.gov/oact/cola/sga.html, last accessed Mar. 12, 2018. Quinn received a $250-$275 rent reduction per month for her work as a manager of her mobile home park, but the ALJ listed this position as one of Quinn's past relevant jobs. AR 21.

Quinn argues the ALJ erred in including her position as the mobile park home manager in his past relevant work assessment. Docket 14 at 19. In response, the Commissioner concedes Quinn's position at the mobile home park does not rise to the substantial gainful activity earnings level, but maintains the ALJ's statement was harmless error. Docket 18 at 15-26.

Notably, while the ALJ included Quinn's position as mobile home park manager in Quinn's list of past relevant work, the ALJ still concluded that Quinn is unable to perform any past relevant work. AR 21. The court finds that listing Quinn's position as a mobile home park manager as past relevant work, standing alone, is not reversible error because the ALJ concluded Quinn could not perform any of her past relevant work. *See Byes v. Astrue*, 687 F.3d 913,

917 (8th Cir. 2012) ("To show an error was not harmless, [the claimant] must provide some indication that the ALJ would have decided differently if the error had not occurred."). Quinn has not established that removing Quinn's position as a mobile home park manager from the list of her past relevant work would have changed the ALJ's decision at step four. But Quinn argues that the ALJ's error was prejudicial when the ALJ identified the mobile home park manager position as a past relevant job from which Quinn acquired transferable skills in step five. Docket 14 at 20. The court will consider this argument in the context of the analysis at step five below.

## III.   Step Five

If the ALJ finds that the claimant cannot perform her past work, the burden shifts to the Commissioner at step five to show that the claimant can perform other work that exists in the national economy. *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (quotations omitted). The ALJ's decision that work, which the claimant can perform in light of her RFC, exists in significant numbers in the national economy must be supported by substantial evidence. *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004). "Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question." *Id.* at 784 (citing *Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996)). The hypothetical posed to the vocational expert (VE) "must include all impairments that are supported by substantial evidence in the record as a whole." *Id.* (citing *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996)).

Quinn makes three arguments in contending that the ALJ erred in his finding that there are a significant number of jobs in the national economy that Quinn can perform. Docket 14 at 22-28.

## A.　Transferable Skills

The ALJ found that Quinn acquired skills from her past work as a mobile home park manager and animal shelter manager that are transferable to the occupations of a general office clerk and file clerk. AR 21-22. Quinn argues this was improper because the ALJ ignored the VE's testimony and there is no evidence in the record to support the finding that Quinn acquired "general clerical skills." Docket 14 at 22-24.

> Transferability of skills is an issue only when an individual's impairment(s), though severe, does not meet or equal the criteria in the Listing of Impairments in Appendix 1 of the regulations but does prevent the performance of past relevant work (PRW), and that work has been determined to be skilled or semiskilled.

SSR 82-41, 1982 WL 31389, at *1 (Jan. 1, 1982).

At the hearing, the ALJ posed a second hypothetical to the VE limiting an individual to work involving only simple, routine tasks of three to four steps and asked if the individual could perform Quinn's past work at a light level. AR 50-51. The VE responded, "judge, I think you are coming up with more of an unskilled level." AR 51. Quinn argues that the ALJ never addressed this testimony and still made his decision about Quinn's transferable skills despite the fact that transferability of skills only applies to a claimant's skilled or semi-skilled past work. Docket 14 at 22. The Commissioner does not address this argument.

"A skill is knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level . . . ." SSR 82-41. "Skills are not gained by doing unskilled jobs . . . ." *Id.* When the issue of skills and their transferability must be decided, the adjudicator or ALJ is required to make certain findings of fact and include them in the written decision. Findings should be supported with appropriate documentation. SSR 82-41.

This issue should be clarified on remand to the ALJ for two reasons. First, the record is unclear as to whether the ALJ's transferability decision relied on the VE's responses to this second hypothetical when the ALJ never corrected the hypothetical after the VE said the ALJ was describing an unskilled level. The ALJ also did not mention this possible discrepancy in the hypothetical in his decision. This was not just harmless error, either. The burden at step five is on the Commissioner to show that Quinn could perform other jobs in the national economy, and transferability is one way to establish that finding. And this court is hesitant to affirm a decision relying on the transferability of skills, when transferability of skills may be improperly based on an inaccurate hypothetical. The ALJ relied on the VE in his step five analysis, but a VE's testimony is only substantial evidence when the VE is given a properly phrased hypothetical. *Tucker*, 363 F.3d at 784.

Second, the VE testified that, based in part on the premise that Quinn acquired transferable skills from her position as the mobile park home

manager, there are some "office clerical types of jobs" that would be available for Quinn. AR 51. *See also* AR 286 (VE's Work History report listing mobile home park manager as a former job where she acquired skills of "manages mobile home park, colelcts [sic] rents, shows, [sic] facilities, directs maintenance staff"). Relying on the VE's testimony, the ALJ concluded that Quinn acquired "general clerical skills" that are transferable to other jobs. AR 21-22. And the mobile home park position is the only basis in the record to establish these skills identified by the ALJ because the only other acquired skills listed by the VE in his Work History report related to capturing strays and caring for animals. AR 286.

On remand, the ALJ should provide more documentation to support his findings on transferability if the issue still arises. *See* SSR 82-41. Additionally, both the hypothetical posed to the VE and the analysis should not include any skills Quinn potentially acquired from her position as the mobile home park manager because a claimant gains transferable skills only from past relevant work. *See id.*

### B. Grid Rule

To determine if a claimant can adjust to other work, the ALJ may also consider a claimant's RFC, age, education, and work experience consistent with the Medical-Vocational Guidelines listed in 20 C.F.R. Part 404, Subpart P and Appendix 2. The Commissioner has the burden to establish that the "claimant's characteristics identically match those contained in the Guidelines." *Fenton v. Apfel*, 149 F.3d 907, 910 (8th Cir. 1998). When

individuals approaching advanced age (age 50-54) "have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disability ordinarily obtains." 20 C.F.R. Part 404, Subpart P, App. 2, 201.00(g).

Under the medical-vocational guidelines, there are three relevant age categories: younger person (under age 50), a person closely approaching advanced age (age 50-54), and a person of advanced age (age 55 or older). 20 C.F.R. § 404.1563. In this case, the ALJ found Quinn not disabled after applying the grid in Medical-Vocational Rule 202.15. AR 22. This grid rule applies to individuals with an RFC to perform light work who are closely approaching advanced age (age 50-54) with a high school education or more, previous work experience in skilled or semi-skilled jobs with transferable skills, and leads to a finding of not disabled. 20 C.F.R. Part 404, Subpart P., App. 2.

Quinn argues that the ALJ applied the wrong grid rule and should have instead applied grid rule 202.06 for individuals of advanced age because Quinn was 55 years old at the time of the ALJ's decision. Docket 14 at 25. The Commissioner, in response, argues that the proper grid rule is 202.07, but it was proper to apply Rule 202.15 up until Quinn turned 55. Docket 18 at 19. Because the applicable grid rule decision depends in large part on whether Quinn acquired transferrable skills from her past relevant work and the issue of transferability will be addressed further on remand, the court will not address this argument. But Quinn's age categorization is vital to this determination so the ALJ is instructed to consider whether Quinn falls within

the borderline age situation or if a different grid rule should apply to Quinn on her alleged disability onset date than to the date she turned 55. *See Phillips v. Astrue*, 671 F.3d 699, 706-07 (8th Cir. 2012) (concluding that the ALJ, while not required to make detailed findings in borderline age situations, is "indisputably" required to consider whether the higher age category should apply to a claimant in order for a reviewing court to determine if substantial evidence exists in the record to affirm an ALJ's decision).

### C.     Conflict between VE's Testimony and DOT

Vocation evidence should be consistent with the Dictionary of Occupational Titles. SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). An ALJ must ask about any possible conflict between the VE's evidence and information provided in the DOT about a job's requirements. *Id.* at *4. Here, the ALJ noted: "Per SSR 00-4p, the undersigned determined that the [VE's] testimony is consistent with information in the [DOT]." AR 22. Quinn argues that the ALJ did not ask the VE if his testimony was consistent with the DOT, so the ALJ's "self determination of consistency" is erroneous. Docket 14 at 26.

The Eighth Circuit has found that an ALJ's failure to ask about consistency is harmless error, but only if there is no actual conflict between the vocational evidence and the DOT requirements for particular jobs identified by the VE. *Renfrow v. Astrue*, 496 F.3d 918, 920-21 (8th Cir. 2007). Thus, Quinn argues there are actual conflicts here because the ALJ's RFC finding and the hypothetical posed to the VE limited Quinn to work "involving only simple, routine and repetitive tasks of about three to four steps." Docket 14 at 26

(citing AR 17, AR 50-51). The VE then identified general office clerk, file clerk, and the unskilled job of storage facility clerk as jobs Quinn could perform, which are all defined in the DOT to require a Reasoning Level 3. Quinn thus contends jobs with a reasoning level higher than 1, such as these jobs identified by the VE, require more than simple, routine tasks of three to four steps. *Id.* at 27 (citing DOT at 174-75).

Here, the ALJ did not ask the VE whether his testimony conflicted with the DOT, and if it did, whether there was a reasonable explanation for the conflict. Because the VE's testimony regarding the positions he listed is based in part on the premise that Quinn acquired transferable skills from her position as mobile park home manager, the court finds it is not appropriate to address this argument at this time. The record does not reflect whether the ALJ or the VE recognized a possible conflict here. *See Kemp ex rel. Kemp v. Colvin*, 743 F.3d 630, 633 (8th Cir. 2014). The appropriate remedy is to have the ALJ address any possible conflict on remand after the VE testifies in response to a proper hypothetical and does not include improper skills in the transferability analysis.

## CONCLUSION AND ORDER

The court finds that the ALJ erred in failing to address whether Quinn's scoliosis, obesity, and neck condition were medically determinable, and possibly severe, impairments. The court further finds that the ALJ's analysis at step five, based on a possibly flawed hypothetical to the VE and an improper

inclusion of Quinn's position as mobile home park manager, contains errors. Thus,

IT IS ORDERED that the decision of the Commissioner is REVERSED and REMANDED for further review.

DATED this 20th day of March, 2018.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE